Thank you. May it please the Court, my name is Rebecca Pannell. I represent the appellant Daniel Campos. The issue in this case is whether or not the government presented sufficient evidence to sustain a conviction for possession with intent to distribute methamphetamine. And both the issues of possession and intent are at play in this case, although we focused a lot on the issue of possession.  If you look at the government's assessment of its evidence, it's based more on assumptions about what was happening rather than what the evidence really showed. The government assumed that because Daniel Campos had lived in that left-hand bedroom on the diagram before, that he was living there in February of 2007 during their search, they assumed that Mr. Campos had exclusive possession of that area because of that past residency, when it was very clear all the evidence was it was nonexclusive possession. Exclusive possession means possession to the exclusion of others. And there were others there, and one other person saying, I'm in charge of this residence, and one other person, Mr. Hernandez, keeping at least some of his belongings there. I understand why you choose the word assume, but why isn't it a reasonable inference from all of the facts, including all of his statements to the probation officer over the years, including the fact that, you know, when he saw him then, it looked like he was living in that room just as the room had looked all the time that he'd been there. His possessions or some I.D. stuff was in the room. All of those things. Why can't you reasonably infer from that that he had possession of the room? Because there was very direct evidence of a change of circumstance. And I do think that the assumptions clouded the ability of the law enforcement officers that were there and the U.S. attorney prosecuting the case to see that there was a change of circumstances. That change of circumstances was in itself rather problematic. His brother didn't know much about where he was, when he might have lived with him, when he might not have. And Mr. Campos was there, and he hid in the bathroom. He was there. He hid in the bathroom. And that's really, I think, the only fact that even should cause pause in this case. I mean, he was there. It's not enough. His brother's testimony, I think. Well, his brother's testimony, you know, lay witnesses don't have the sort of timelines that other people have. But it was, you know, the jury could find that that was all nonsense. Well, they didn't convict on all counts. Clearly, the jury thought there were other people there. Even if the brother's testimony was impeached and you think that the brother was staying at that house, other people were too. So the issue was where was he staying on that day, and was it to the exclusion of other people? There's an assumption that Daniel Campos was in that bedroom that day, and he must have seen the drugs in plain view. But he wasn't found there. There are no cases that I've found where a person is not found in the bedroom where things are in plain view and then held responsible for those things in plain view unless there is continuing evidence of exclusive possession. And in this case, with somebody else clearly storing their belongings in that bedroom and saying, I'm in charge, and then with other testimony of people saying, yes, he was there, not just the brother, other witnesses too saying he was there, he was in charge of the residence, what was he doing there? Even worst-case scenario, if Daniel Campos rented the house out to people while his parents were gone to sell drugs, maybe he's involved in a conspiracy but not possession with intent. He didn't ever tell his probation officer that he had moved. No, and clearly there's reasons why he was hiding. He was moving around. He wasn't where he was supposed to be. And so that is why he was hiding behind the water heater. But this court and then the 28-J letter that I sent, the Sixth Circuit, also came out with a recent case saying that an act of sort of evasion, if there's another explanation for it that is just as likely, that that's not enough to overcome the mere presence defense. And I would say in this case the government thinks that, oh, because he hid behind the water heater and got stuck, he must have hidden quickly and didn't have time to hide things. I'm not sure how hiding and getting stuck is more indicative of hiding quickly versus slowly. But if all you're concerned about is a probation violation, that's not very much time in jail. You would just go hide yourself and not worry about other things. But if he knew that there were drugs sitting on top of a hamper and the witness testified right next to her when she went into the room, there were drugs right there, if he knew about those drugs, common sense would say he would have hidden those drugs, which would carry a long time in prison, instead of hiding himself for a probation violation for only a few days. So it doesn't seem likely, looking at it from a logical point of view, that his act of evasion is explained by wanting to not be caught with drugs as opposed to just not wanting to be caught for a probation violation. So then all you have are the facts that he was there. Well, that's not enough. He used to live there, but that's not enough, since in the past we know that that house was not used for drug dealing. There was even a witness, a law enforcement officer, who testified that he'd been a neighbor, and this was not a drug dealing house. To the extent there was any drugs in that room, that's a change of circumstance. The change of circumstance, too, is there was new people living there, new people who had never been there before, new people, at least Mr. Hernandez, who had his things in that room, witnesses, though they may have had some problems, nevertheless had hard cooperation with his items in the room, saying that he was there, him saying that he was there. Even if both of them were in that room, you would have to show possession as to one but not the other. Law enforcement said, we think there was only one person staying in the room because there was one bed, and they assumed that that one person must have been Mr. Campos. But with Mr. Hernandez storing his items there, and they say, well, he didn't have anything else besides that bag, but they didn't inventory the clothing. They didn't look at whether or not the clothing was Mr. Campos's or Mr. Hernandez's or a third person. The items they pointed to were some letters from 2004, this was 2007, a work ID that was from 2005 from Mr. Hernandez. Nothing in that room was currently Mr. Hernandez's. And it's a very different case from this United States v. Martinez case, which is mentioned in the briefing, where some pants the defendant said had his money in it, $2,000, were found in the bedroom with drugs in plain view. In that case, this Court said based on those facts and the fact that there was a recorded conversation with the defendant talking about selling drugs, those facts were enough to create a sufficient evidence. But in this case, he's not seen in that room that day. We have no evidence that he was in that room that day at all. We have $700 of cash. $700, which significantly there was an explanation for, both an explanation verbally and then corroborated that there was a bill. And the case, Lopez, that the government thinks is so much like this case, in that case they called an expert who explained that the money that the person had matched drug money, and in that case it was over $2,000, much more money. But the officer in that case said, look, the amount of drugs we found is divided into a certain amount of dosages of cocaine. Those dosages sell for $10 apiece, and $20 is a usual increment, and this person had $63.20 bills. In that case, there were other facts, too, that tied Lopez to the drugs, but in that case that was a significant fact. Here we have no expert testimony, no claim that this money somehow resembled drug money, and an explanation from Mr. Campos at the time, and then other defense witnesses and an exhibit showing why that money is explained for. If I can, I'll reserve the rest of my time. Certainly. Mr. Eckstrom. May it please the Court. Alexander Eckstrom on behalf of the Appellee United States of America. Your Honor, the government agrees that there are two issues, and that would be the sufficiency of the evidence for the defendant's initial possession of the residence, and then also the evidence regarding the intent to distribute. Key is the testimony of Corrections Officer Heise, that starting in 2002 up to three weeks before the date in which the Secretary's warrant was served, the defendant was a probationer on supervision and had filled out forms indicating this was his residence, acknowledging his duty to update his residence, and significantly in both November and December, he submitted the forms showing the Toppenish residence as his. Now, also, after his release on the underlying Department of Corrections violation on which he was arrested on the 13th of February, he returned to that residence and, again, completed those forms in April and May. Corrections Officer Heise returned to the residence and determined that the appearance of the residence, and particularly the bedroom, was the same as it had been before. The Corrections Officer had been there and had been shown the room, shown that it was the defendant's room, and had been told the procedure, if you knock on the front door and I'm not there, come to the side door. The decor remained the same in the room, both before and after when the defendant was a resident. Her possessions of another person there, Hernandez. Is that right? There was a jacket identified by Mr. Hernandez as his, contained in a bag. I don't believe the record indicates whether or not there was a specific question as to ownership of the bag. There's the implication that the bag belonged to Mr. Hernandez. Were there any articles attributable solely to Campos in the room? There was the Del Monte ID card that, as counsel has indicated, was, I believe, issued a couple of years earlier, but was on the dresser. How about clothes in the closet? Any sign of occupancy by him? There is evidence in the record that there were clothes, but as counsel has indicated, there was no specific inquiries to the ownership of the clothes in the closet or strewn around that particular bedroom. So we have the general comments of the decor being the same, but no specific information as the court so far. Somebody moves out of a room, you don't repaint the room. Indeed. What do you mean by decor? What was the decor specifically that would have been expected to change? Your Honor, I'm not in a position to answer the specific question because I believe the record indicates the corrections officer's testimony only that the decor remained the same. There was no further inquiry into the record as to what the word decor meant. No evidence as to the ownership of the clothes that were strewn around? No. The record indicates that there were clothing, but no evidence of specific ownership of the clothing in the room. Except for the duffel bag. Except for the jacket found in the duffel bag. So Hernandez didn't lay claim to anything else, just the duffel bag. No, that's correct. So the only thing that specifically, aside from the officer's visual observation that linked Campos to continuing occupation of that particular bedroom was the ID card? The ID card on the day of the 13th, yes. On the day of the 13th. And it's undisputed that others had access to and that Hernandez himself had an article of clothing in that bedroom. So this isn't one where one can say there was exclusive occupancy. Just as in Martinez, other individuals did have access to the room. Mr. Martinez, while contacted at the front door, I believe the diagram of the residence, which is in evidence, indicates that there was an egress and entrance point from where he was located to the room. That's correct. Now, from Corrections Officer Heise, the jury had the information that this was the defendant's room by his own statement, and that he had visited multiple times, had found the defendant there, and had, in fact, contacted the defendant in that bedroom. This happened both before and afterwards. He had filed no information indicating that he had changed his residence, and also Corrections Officer Vela indicated that she had also visited a similar number of times. After the incident? No, before the incident. Actually, Your Honor, I believe the record simply indicates that she was asked how many times she had visited him at the residence. She had answered between five and ten. I don't know that the question was focused specifically as to whether the visits were before or after the incident on the 13th. So there's no evidence of anybody having contact with him post the incident? I believe that... That would place him in that room? I believe that Officer Heise had contact with him after the incident. And he still gave that as the address? Correct. Okay, that's what I wasn't understanding. I apologize if I was unclear in my initial comments. Now, with that as a baseline, and we would submit that the jury was allowed to accept that, there is the impeaching evidence from the defense. And Mr. Compost, Mr. Zamarripa, and also Mr. Zuniga gave evidence indicating that he was elsewhere, but there are problems with their testimony. They conflict each other, conflict with each other. And there, for instance, Mr. Zamarripa indicates that he'd been there over a hundred times, but indicated an entirely different bedroom that the defendant had lived in. And so it's our position that the jury was entitled to, after weighing the evidence, and as Lopez says, there is a deferential review of that, to conclude that this was the defendant's bedroom. Dealing with the issue of flight, each party can put a cast on what the flight means. I would submit that an individual getting stuck behind a water heater shows at least some haste. The rationale for why he ran, again, the jury is entitled to look at that with all the evidence  It is just as reasonable to assume that the defendant, knowing that the contraband is there, immediately tries to secrete himself in the place he thinks he's least likely to be found, in the hopes that he will not be found. Records are replete with individuals making decisions that, upon reflection, perhaps were not the best. But the jury looked at this and was entitled to make that determination about the character of his flight. The defense cites several cases which I would simply indicate are co-tenancy cases. Barajas, Montiel, Valenzuela, Corral, Gastelum, where we either have clear cases of individuals with equal access due to meretricious relationships or marriages with the space to be searched, or as in Gastelum, you have multiple defendants and you have large distances between the subject contraband and the individuals. Again, under Lopez, we have a jury determination and we would submit that that is reasonable. As to the evidence of intent to distribute, again, the Lopez case says that 4 to 5 grams are enough to show intent. In this case, we not only have the controlled substance, but we have the packaging, we have the scales, and we also have the monitor, which is not only linked to the camera, but was operable with the camera covering the front door. And so in that case, just like Johnson, we have methamphetamine, we have plastic bags, we have a scale. Instead of the O-sheet in Johnson, we have the operable monitor hooked up to the camera. The defense argues in their brief that the acquittal on the gun charges weakens the government's argument as to the controlled substance found in the same dresser. And simply submit that in this case, there is a nexus from the same type of controlled substance to other items found in plain view and to the monitor, which is actively monitoring the front of the house. I have nothing further unless the Court has questions of me. Okay. Thank you. Ms. Powell. The issue of the monitor is an interesting one. The question is was there any change in the decor or in the room. One thing we know is before when Officer Heise had came to the residence, when Mr. Campos said he was living there, there was no monitor surveillance equipment. And then after when Mr. Campos was released, there was no monitor and monitoring equipment. So that was a change that was documented in the record. Something different was going on, consistent with the idea that Mr. Campos's parents were in Mexico for a few months, and during those few months, someone else was staying there. It wasn't a permanent new tenant, but there were different things going on. Judge Reimer asked if Mr. Hernandez denied ownership, I think it was, or didn't make claim to other things. Made claim to other things. It's not on the record one way or another. He claimed the duffel bag. He claimed the bag and the vest in the bag when he was asked to show his patches. But he wasn't asked, as far as we know, and there would be hearsay problems with that too, of whether or not other things in the room were his or not. It's just not on the record whether or not the other things in the room were his. Nothing about the clothing one way or another. Nothing about the clothing one way or another. The only piece of clothing we know in the room belonged to someone was Mr. Hernandez. We don't dispute, have never disputed, that Daniel Campos has resided in that room in the past. The items attributable to him were old items, nothing that suggested current residency, an old work ID and a couple of very old letters. Nothing current. With respect to the individual saying, well, Mr. Campos used to stay in different rooms, one also has to put into perspective their relationship with Mr. Campos. This was a family home the family had for 30 years, and people knew Mr. Campos his entire life and identified different rooms with him. Mr. Heise knew Mr. Campos for a couple of years and attributed one room. So I don't think it's as conclusive as the government would indicate. Thank you. All right. Thank you, counsel. Thank you very much, both of you, for your argument. And the matter just argued will be submitted. Thank you. And we'll next turn to a
judges: Fletcher, Rymer, Fisher